MILGROM *v.* INVESTMENT MANAGEMENT COMPANY.

1. CIRCUIT COURT COMMISSIONERS—REPORT—EVIDENCE.

The report of a circuit court commissioner is not necessarily conclusive upon a circuit court merely because supported by some testimony, as such report has not the same standing as the report of a referee in a lawsuit, it being only advisory.

2. APPEAL AND ERROR—CHANCERY CASE—DE NOVO REVIEW—REPORT OF CIRCUIT COURT COMMISSIONER—EXHIBITS.

On *de novo* review of suit to rescind and withdraw from purchase agreements in which no witnesses appeared before the trial judge and he had before him nothing but the typewritten testimony taken before the circuit court commissioner, besides the exhibits, from which to determine disputed facts, the Supreme Court has as good an opportunity to determine such facts as had the trial judge.

3. EQUITY — RESCISSION — ACCOUNTING — FRAUD — PRINCIPAL AND AGENT—FINDINGS OF CIRCUIT COURT COMMISSIONER—EVIDENCE.

In purchasers' suit to rescind and withdraw from purchase agreements and for an accounting, evidence established collusion between individual defendant and absconder who obtained the "investments" from plaintiffs as claimed by latter whereby they were defrauded in the amounts proved and established by the circuit court commissioner and that the absconder was the agent of the other defendants in the matters complained of.

4. PARTIES—JOINDER OF PLAINTIFFS—MULTIPLICITY OF SUITS—ACCOUNTING.

The joinder of several plaintiffs in suit to rescind and withdraw from purchase agreements and for an accounting promoted the convenient administration of justice where the right of each to an accounting depended on the showing of the same active

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 3 Am Jur, Appeal and Error, § 913; 45 Am Jur, References, §§ 37, 45.
[4] 19 Am Jur, Equity, § 77 *et seq.*; 39 Am Jur, Parties, § 33.

collusion between the individual defendant and an absconder who obtained the funds from the plaintiffs, since a multiplicity of suits was thereby avoided (CL 1948, § 608.1).

Appeal from Wayne; Richter (Theodore J.), J. Submitted June 16, 1949. (Docket No. 5, Calendar No. 44,262.) Decided December 8, 1949. Rehearing denied January 9, 1950.

Bill by Joseph Milgrom and others against Investment Management Company, a Michigan corporation, and others to rescind and withdraw from purchase agreements, and for an accounting and other relief. Decree for defendants. Plaintiffs appeal. Reversed.

*Lewis Daniels* and *Felix F. Silver* (*Friedman, Meyers & Keys,* of counsel), for plaintiffs.

*Wm. Henry Gallagher* (*Abraham Satovsky,* of counsel), for defendants.

Reid, J. Plaintiffs filed the bill of complaint in this case in chancery for a decree that they are entitled to rescind and withdraw from purchase agreements, for an accounting, for a determination that each of the defendants is jointly and severally liable to each of the plaintiffs for certain moneys turned over to defendants for investment, and for other equitable relief. The case was referred to a circuit court commissioner for the taking of testimony. In his report to the lower court, the circuit court commissioner recommended that decree be entered in favor of each of the plaintiffs in substantially the sum claimed by each such plaintiff. The trial judge disregarded the report and recommendation of the circuit court commissioner and entered his decree dismissing the bill as to each of the plaintiffs. From the decree thus entered, each of the plaintiffs appeals.

Defendant Saul Katz is principal stockholder of the defendant Investment Management Company, a Michigan corporation, the incorporation papers of which were filed October 23, 1933. Katz and the Investment Management Company are the sole remaining defendants.

The said corporation is a closed corporation, the stock being owned by Katz and members of his family.

At some time in 1935, defendant Katz went through bankruptcy and obtained his discharge in bankruptcy as having no assets. When the discharge in bankruptcy occurred, the properties standing in the name of Katz and his wife by the entireties apparently were not required in the bankruptcy proceedings to be surrendered for the benefit of the creditors of Katz individually. Some of the large apartment houses now owned by Katz or his family or the defendant company were then in the name of Katz and wife.

Within a short time after having been discharged in bankruptcy, Katz began the acquisition of large apartment houses and within a few years was himself individually the owner of 6 large apartment houses besides others that he transferred to the defendant company or to his children, retaining a trusteeship over the properties assigned to his children. The bulk of these properties was acquired by Katz within 5 years after his discharge in bankruptcy.

Defendant Katz had in his employment a maintenance man and laborer by the name of Frederick Stevenson, a colored man. When Stevenson first started working for Katz about the year 1936, he (Stevenson) was receiving $18 a week wages and when he ceased the employment he was receiving $70 a week. It is the claim of plaintiffs that Katz and Stevenson entered into an agreement to obtain money from various persons through the contacts

of Stevenson for the ostensible purpose of being invested but for the real purpose of causing that the investors should lose to defendants and Stevenson substantially all, or as nearly all as possible, of their investments through a defalcation scheme, the exact details of which are not made clear in the testimony. Plaintiffs claim the defalcation scheme would permit Stevenson to abscond (which he in fact did) or go through bankruptcy. Katz did not participate in the actual signing of the "investment" papers nor was his name mentioned thereon. Plaintiffs claim and there is testimony to show that soon after Katz's discharge in bankruptcy it became rapidly apparent that he was a very well-to-do man, and that the "victims" were led to consider that the property of the 2 defendants (Katz and the investment company) was property in which their (plaintiffs') moneys were invested or which in some way assured to the investors the return value of their investment.

Plaintiffs claim that Katz caused that Stevenson be furnished with cards with the name of defendant Investment Management Company printed thereon and the name of Stevenson also printed thereon to indicate that Stevenson was the agent of said investment company. There is testimony that some of the investors were introduced by Stevenson to Katz with the statement, "Saul, I want you to meet one of our investors," or words to that effect, and that Katz indicated that he was agreeable to the proposition that the proposed investor should become an investor. Plaintiffs also claim that Katz said to one of the investors, "That is the best investment you can make."

Plaintiffs further claim and there is testimony to show that the secretary and the bookkeeper employed at the office of and by the investment company, were habituated to turn over to Stevenson callers at the office whose errand seemed to be in the

investment line rather than paying any rents to the
office and that some "investments" were actually
made in the presence of, and with the participation
of, the secretary or bookeeper.  Plaintiffs claim fur-
ther and there is convincing testimony to show that
Katz and his office force commingled some of the
funds obtained by Stevenson from the "investors"
with the funds of the Investment Management Com-
pany and of Katz himself.  One of the plaintiff in-
vestors testified he paid $2,000 as a real estate in-
vestment to Stevenson, and that Stevenson turned
it over to Katz, who put it in his pocket.  One in-
vestor's check for $1,000 was received into the funds
of defendant investment company.

Plaintiffs further claim that actions were taken
and apparent authority purposefully and wilfully
displayed by Katz to create the impression in gen-
eral that the investors were investing in real estate
of the defendant investment company.

Plaintiffs claim that the disappearance of Steven-
son in February, 1945, was caused by pressure
brought to bear on him to pay back to certain in-
vestors some of their money.  Stevenson's where-
abouts are still unknown, although a warrant is out
for his arrest because of his fraudulent conduct.
Stevenson was made a defendant but no service upon
him having been obtained, the case was discontinued
as to him.

Defendants claim that there was no conspiracy be-
tween defendant Katz and Frederick Stevenson to
defraud plaintiffs, and that the fraudulent repre-
sentations and persuasions of Stevenson to procure
money from would-be investors were all matters for
which Stevenson had the sole responsibility, and
that Katz had not intentionally given any person
any impression that he was in anywise a party to
Stevenson's obtaining the investments.

Defendant Katz denies that he said to any person in anywise anything to indicate that he was satisfied to receive that person as an investor, and denies that any of plaintiffs' moneys were commingled with the funds of the investment company. Defendants further claim that the investment company was a closed corporation, and that no investments were desired by Katz to be made by any would-be investor in any of the properties held by the investment company, by Katz individually or by his children or wife, in anywise. It is conceded that Stevenson was never an officer, stockholder or director in defendant corporation. Defendants further claim that the statements of the various witnesses indicating the collusion between Katz and Stevenson are all perjured testimony and defendants deny that they are liable for any of the balance due any of the so-called investors and of the plaintiffs and of each of the plaintiffs in particular.

Defendants claim that Stevenson disappeared because Katz "fired" him with strong disapproval of Stevenson's accepting money from "investors," so that Stevenson became frightened by Katz's language and absconded. However, one check for $1,000 was issued by Katz to Stevenson in February, 1945, although Katz testified he first knew in December, 1944, of Stevenson's wrongful transaction.

Plaintiffs claim that many checks of Investment Management Company were given Stevenson by Katz for the purpose of enabling Stevenson to show the checks to intended victims as dividend checks and so to impress the victims with the profits of the "investment," the checks being returned by Stevenson in some cases within a few days, and plaintiffs claim that the exhibition of such checks was a notable aid to Stevenson in fraudulently procuring the money of would-be investors.

There is testimony that a total of 65 checks (not salary checks) were issued to Stevenson and that there were in one month (April 12, 1944 to May 13, 1944) 12 such checks ranging from $200 to $500 each and totaling $5,700; that of the 65 checks, 17 were returned by Stevenson to defendant investment company within a few days after issuance, and that 8 checks were redeposited by the defendant investment company in its own bank account the day after issuance, which 8 checks were never cashed by Stevenson.

There was testimony by plaintiffs Milgrom and Skinner that Stevenson exhibited checks given him by defendant company, Stevenson claiming they were dividend checks.

Defendants claim that the checks were for the most part given in exchange of checks but defendants give no satisfactory explanation of the necessity for exchanging checks with Stevenson.

There is testimony to show that Stevenson had his office in the same suite with defendant Katz and defendant company in the First National Bank Building in Detroit. It is undisputed that Katz knew that Stevenson purchased a large and valuable residence in 1943 and had 2 automobiles, while earning $60 per week.

The "investments" procured by Stevenson were all evidenced by notes given by Stevenson; Katz's name did not appear on any of the notes. There was no receipt given for payment as though for the purchase of stock nor any designation of what company the "investment" was made in nor was there any specification as to dividends or preference over other investors. The matter of the "investments" was in such shape that Stevenson could abscond or go through bankruptcy with nothing in writing to connect Katz with Stevenson's debts or the investors' "investments."

Plaintiffs argue that the report by the circuit court commissioner is conclusive, where supported by some testimony. This is a chancery suit and the report of the circuit court commissioner has not the same standing as the report of a referee in a lawsuit. See *Sant* v. *Perronville Shingle Co.,* 179 Mich 42, 51.

"The circuit judge was not bound to follow the report of the commissioner, for it was only advisory." *Jacobs* v. *Dearborn Holding Co.,* 270 Mich 55, 56.

In hearing this case *de novo,* we do not have the result of personal observation of the witnesses by the trial judge, who had nothing but the typewritten testimony taken before the circuit court commissioner, besides the exhibits, from which to determine disputed facts. We have as good an opportunity to determine the disputed facts as had the trial judge. Under such circumstances we must turn to the report of the circuit court commissioner and give careful attention to the printed testimony to determine the accuracy and apparent correctness of the circuit court commissioner's report, and proceed to make our own determination of the facts.

Plaintiffs have recited in considerable circumstantial detail facts tending to show Katz's participation in the fraud of Stevenson. It is difficult to accept Katz's own individual unsupported denial of the facts so recited as against the testimony of the several witnesses. Katz's sudden rise to wealth so soon after his discharge in bankruptcy requires that we review with careful attention his claims to honesty in his transactions. Katz as a witness was shifty, self-contradictory and evasive on important matters. Under all the circumstances of this case, we conclude that the collusion between Katz and Stevenson as claimed by plaintiffs, is fairly established and the amounts of which plaintiffs were in

consequence defrauded, are proven and established, as found by the circuit court commissioner. Stevenson was the agent of defendants in the matters complained of.

Defendants claim a misjoinder of plaintiffs. A multiplicity of suits was avoided by plaintiffs joining in this one suit. The right to an accounting depended on by each plaintiff is in the case of each plaintiff, the showing of the same active collusion between Katz and Stevenson. Under all the facts and circumstances of this case, the convenient administration of justice was promoted by the joinder.

"The plaintiff may join in 1 action, at law or in equity, as many causes of action as he may have against the defendant, but legal and equitable causes of action shall not be joined; but when there is more than 1 plaintiff, the causes of action joined must be joint, and if there be more than 1 defendant, the liability must be one asserted against all of the material defendants, or sufficient grounds must appear for uniting the causes of action in order to promote the convenient administration of justice, or when several suits shall be commenced against joint and several debtors, in the same court, the plaintiff may, in any stage of the proceedings, consolidate them into 1 action. If it appear that any such causes of action cannot be conveniently disposed of together, the court may order separate trials, or whenever several suits shall be pending in the same court, by the same plaintiff against the same defendant, for causes of action which may be joined, the court in which the same shall be prosecuted may, in its discretion, order the several suits to be consolidated into 1 action." CL 1948, § 608.1 (Stat Ann § 27.591).

See *Goodrich* v. *Waller*, 314 Mich 456.

The decree appealed from is reversed. A decree will be entered in this Court in accordance with this opinion. Costs to plaintiffs.

Sharpe, C. J., and Bushnell, Boyles, North, Dethmers, Butzel, and Carr, JJ., concurred.